IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CRAIG LAMAR REID,

       Petitioner,                          No. 2:06-cv-1627 FCD KJN P

    vs.

WARDEN, HIGH DESERT STATE PRISON, et al.,

       Respondents.                   FINDINGS AND RECOMMENDATIONS

/

         Petitioner is a state prisoner proceeding without counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2004 conviction of first degree robbery. The trial court found petitioner suffered a prior serious felony conviction within the meaning of California Penal Code § 667(a), and a prior prison term within the meaning of California Penal Code § 667.5(b). Petitioner was sentenced to eighteen years in state prison. Petitioner raises one claim in his petition, filed July 24, 2006, that his prison sentence violates the Constitution.

////

////

1

FACTS

The opinion of the California Court of Appeal contains a factual summary.[1]  After reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> In 2002[,] Pete Fagre was an independent contractor with Yellow Cab.  He leased the cab and received fares by responding to calls from the Yellow Cab dispatcher and to his own cellular telephone.  To generate business, Fagre distributed business cards around town, including at the Exxon station at the corner of Fulton and Marconi Avenues.
>
> On June 5, 2002, at approximately 4:00 a.m., Fagre received a call from Exxon employee Gordon Hoeft that some customers needed a ride.  When he arrived, [petitioner] and Genea Smith were waiting outside.  [Petitioner] wanted Fagre to take them to Vince's Motel on Folsom Boulevard in Rancho Cordova.
>
> During the 15-minute drive, Fagre and [petitioner] talked about the job corps and about drugs.  [Petitioner] asked Fagre whether he used drugs in order to stay awake so he could work at night.  Fagre said he had not done drugs in over a year.  [Petitioner] said he had done them in the past and had just been released from jail.  When Fagre dropped [petitioner] off, [petitioner] told him he was a good cab driver and asked for his business card.
>
> At approximately 6:30 p.m., Fagre received a cellular telephone call from [petitioner], asking him for a ride.  When Fagre arrived at the corner of Martin Luther King Boulevard and 21st, Smith and [petitioner] entered the cab.  Halfway through the trip, [petitioner] whispered to Smith and the two became quiet.  [Petitioner] told Fagre to take the El Camino Avenue exit.  Fagre refused because it was not the proper exit.  Fagre exited at Marconi Avenue and, as he attempted to move into the left lane, [petitioner] told him to keep going.  [Petitioner] then instructed Fagre to pull over.  Smith got out of the car and walked down the street.  [Petitioner] also got out and appeared to be looking for his money.  [Petitioner] told Smith, "[B]itch, get back here, give me my money."  She responded, "I don't have any money, you know that."  Smith got back in the car[2] and [petitioner] said he needed to go to the "ATM" to get some money.  Fagre suggested the Bank of America, which was close by, but [petitioner] refused.  [Petitioner] told Fagre to drive to Edison and Howe Avenues, where he could get money

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Reid, No. C047359 (February 24, 2005), a copy of which was lodged by respondents.  (Lodged Doc. ("LD") 4.)

[2]  Fagre could not recall whether [petitioner] pulled Smith into the car.

2

from his friends.  As they approached the intersection, [petitioner] said his friends were not home and instructed Fagre to turn left on Howe Avenue.  As they passed Rainbow Street, [petitioner] said he saw his aunt's car and told Fagre to pull over.  Smith got out of the cab and started walking down the street.  [Petitioner] came up behind Fagre, put a gun that was wrapped in a coat up to his head,[3] and said, "[T]his is a robbery, mother fucker, give me the money or I'll blow your fucking head off."  Fagre handed [petitioner] $180.

Fagre immediately called 911 and said he had been robbed.[4]  [Petitioner] had disappeared, but Fagre saw Smith two or three minutes later on the next street.  Smith tried to flag down several cars and succeeded in getting a Mazda to pull over and let her in.  Fagre followed the Mazda.

Jasmine Washington was driving the Mazda.  She saw Smith, who she believed was 18 or 19 years old, running to the middle of the street waving her arms back and forth, looking frightened, scared, and shaken up.  Her hair was messed up, her breasts were hanging out of her shirt, and she looked as though she was running away from something.  Washington asked Smith if she was okay.  She said "no" and that her boyfriend had beaten her up.  She was crying.  Once inside Washington's car, she was shaking and talking loudly, like she was hysterical.  Smith asked to be taken home.

After driving approximately two blocks, Washington noticed a taxicab behind her and wondered aloud why it was following her.  Before they reached Fulton Avenue, Washington heard sirens and saw two police cars coming toward them.  Smith then said that her boyfriend had robbed the cab driver but she did not know he was going to do it.  She also said that she did not do it.[5]  The police pulled them over at gunpoint and handcuffed them.

Sacramento County Sheriff's Deputy Matt Curtis interviewed Fagre shortly after he observed Fagre following the Mazda.  Fagre was visibly upset, shaking, having a hard time talking, and chain smoking.  Fagre said that when he gave the money to [petitioner], both Smith and [petitioner] got out of the car and then [petitioner]

---

[3] Fagre testified he could feel the barrel of the gun but did not actually see it.

[4] The police reported the call as coming in at 7:37 p.m.

[5] When asked on cross-examination whether Washington told a detective that Smith told Washington to tell the police that she (Smith) did not do it, Washington said she might have and that "sounds pretty correct."  Washington said that her statement to the detective and her testimony were "[p]retty much the same statement."  Defense counsel noted that the difference was whether or not Smith directed Washington to tell the police that she did not do it.  Washington said it was the same statement: "She told me she didn't do it.  She didn't know her boyfriend was going to do it.  Then she said I didn't do it, I didn't do it."

3

took off. Fagre never said he actually saw the gun.

Smith directed Sheriff's Sergeant Kenneth Georges, Deputy Curtis, and Deputy Aaron Zelaya to an apartment at 2401 Marconi Avenue, a little over a quarter of a mile away from the robbery. [Petitioner's] mother, Terry Reid, was inside the apartment. Terry Reid said that [petitioner] had arrived at her apartment at approximately 8:30 p.m., yelling to be let in. He was sweaty and agitated and kept asking, "[W]here is the girl[?]" He came inside and changed his clothes. She overheard him saying on the telephone that he had just gotten some money and that he called for a cab. [Petitioner] stayed for 25 to 30 minutes. At trial, Terry Reid denied making these statements.[6]

On June 12, 2002, deputies found [petitioner] hiding in the bedroom closets of one of the apartments at the complex where his mother lived. Investigators from the Sacramento County District Attorney's Office unsuccessfully tried to locate Smith, using her aliases, past addresses, and other identifying data.

[Petitioner] testified in his own behalf. In June 2002 he was a cook at A Touch of Class and on the side sold rock cocaine from a house located between 21st and 36th Avenue. He had known Smith for a couple of weeks and thought she was a prostitute.

On June 5, 2002, he wanted to buy snacks from the Exxon station and then go to Vince's Motel with Smith. He saw Fagre and Smith talking, so he assumed they knew each other. In the cab on the way to the motel, Fagre said he used drugs and asked [petitioner] if he knew where to get drugs. Fagre gave Smith his business card and said he would check with [petitioner] later. [Petitioner] and Smith spent the night at a friend's motel room. In the morning, [petitioner] had a friend take him to 21st and Martin Luther King Boulevard so he could sell drugs.

Smith pulled up to the house at that location in a cab and told [petitioner] that she wanted to purchase an "eight ball," or about four and a half grams, of drugs. [Petitioner] weighed out the amount, and Smith paid him $80 and left the house, heading in the direction of the cab.

Smith came back 10 minutes later and said that "the person" wanted something bigger. [Petitioner] went outside. Fagre honked his horn and Smith waived at [petitioner] to come inside the cab with her. [Petitioner] initially wanted to go to his mother's house, where he kept larger amounts of drugs, but instead they went to Hubacher Cadillac to see if his car was ready. [Petitioner's]

---

[6] Terry Reid had felony convictions for check fraud, assault with force likely to produce great bodily injury, and false impersonation.

>girlfriend, Beverly Vickers, had dropped it off the previous morning.[7]
>
>[Petitioner] then directed Fagre to his mother's apartment complex, where [petitioner] gave his mother drugs, changed clothes, and weighed the drugs he was going to give to Fagre. When he returned to the cab, Smith was no longer there. Fagre asked for the "stuff" and [petitioner] asked for money. Fagre said he had already given [petitioner] the money. [Petitioner] started looking for Smith while Fagre followed in his car. Fagre said he did not have time for this, asked [petitioner] to give him what he came out there for, and told [petitioner] that if he did not, Fagre was going to call the police and claim [petitioner] had robbed him.

(People v. Reid, slip op. at 2-8.)

PROCEDURAL HISTORY

Petitioner appealed to the California Court of Appeal, Third Appellate District. The Third District Court of Appeal affirmed petitioner's conviction and sentence on February 24, 2005. (LD 4.) Petitioner filed a petition for review in the California Supreme Court. (LD 5.) The California Supreme Court denied the petition on May 11, 2005. (LD 6.) Petitioner did not seek habeas relief in the state courts. (Pet. at 2.)

ANALYSIS

I. Standards for a Writ of Habeas Corpus

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citation omitted). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

---

[7] According to the service manager at Hubacher Cadillac, there was no record of a Cadillac being brought in for service, under the name of either Reid or Vickers, on June 4 or 5, 2002.

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citation omitted).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

(2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."); accord Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167.

II. Sentencing Error

Petitioner claims that he was denied his Sixth Amendment right to trial when he was sentenced to an aggravated term based on findings of facts that were not submitted to a jury. (Pet. at 5.)

Respondent argues that the state court's finding that California's determinate sentencing system does not violate the right to a jury trial is not contrary to or an unreasonable application of clearly established Supreme Court precedent. (Ans. at 19.)

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The state court rejected this claim as follows:

> The court imposed the upper term for [petitioner's] robbery conviction for the following reasons, noted in the probation report: the offense required planning; [petitioner] has engaged in prior acts

of violent conduct; his prior convictions are substantial;[8] [petitioner] has served a prior prison term; and [petitioner's] performance on parole has been unsatisfactory. The court specified it did not find any circumstances in mitigation.

Applying the Sixth Amendment to the United States Constitution, the United States Supreme Court held in *Apprendi* that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be tried to a jury and proved beyond a reasonable doubt. (*Apprendi, supra*, 530 U.S. at p. 490.) For this purpose, the statutory maximum is the maximum sentence that a court could impose based solely on facts reflected by a jury's verdict or admitted by the [petitioner]. Thus, when a sentencing court's authority to impose an enhanced sentence depends upon additional fact findings, there is a right to a jury trial and proof beyond a reasonable doubt on the additional facts. (*Blakely, supra*, 159 L.Ed.2d at pp. 413-414.)

Relying on *Apprendi* and *Blakely*, [petitioner] claims the trial court erred in imposing the upper term because the court relied upon facts not submitted to the jury and proved beyond a reasonable doubt, thus depriving him of the constitutional right to a jury trial on facts legally essential to the sentence.

The contention fails. One of the reasons the trial court gave for imposing the upper term is [petitioner's] prior criminal convictions. (Cal. Rules of Court, rule 4.421(b)(2).) As we have noted, the rule of *Apprendi* and *Blakely* does not apply to a prior conviction used to increase the penalty for a crime. Since one valid factor in aggravation is sufficient to expose [petitioner] to the upper term (*People v. Cruz* (1995) 38 Cal.App.4th 427, 433), the trial court's consideration of other factors, in addition to the prior convictions, in deciding whether to impose the upper term did not violate the rule of *Apprendi* and *Blakely*.

(LD 4 at 14-15.)

---

[8] The probation report recounted that [petitioner] had the following convictions: felony burglary, attempted receipt of stolen property, and possession of cocaine, all in Ohio in 1991; second degree robbery (Pen. Code, § 211) in 1994, when [petitioner] robbed a video store clerk at gunpoint; and misdemeanor battery (Pen. Code, § 242) in 2000, when [petitioner] became "physical" with his wife after she called police to report an argument with him. He had also been arrested for the following offenses: assault with intent to commit mayhem/rape (Pen. Code, § 220) while armed with a firearm (Pen. Code, § 12022, subd. (a)(1)) in 1993, when [petitioner] displayed a handgun to a man and his girlfriend after he loaned the man $50 and demanded sex from the girlfriend as repayment; and driving under the influence of alcohol or drugs (Veh. Code, § 23152, subd. (a)), being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)), and possession of drug paraphernalia (Health & Saf. Code, § 11364) in 2002, which case had been continued as of the date of the probation report.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court made it clear that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490; accord Cunningham v. California, 549 U.S. 270, 274-75 (2007); Blakely v. Washington, 542 U.S. 296, 301 (2004). The Court in Apprendi found that recidivism was distinguishable from other matters employed to enhance punishment because (1) "recidivism is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence," (2) "recidivism does not relate to the commission of the [charged] offense[,]" and (3) prior convictions result from proceedings that include substantial procedural protections. Apprendi, 530 U.S. at 488 (internal quotation marks, alterations and citations omitted). In carving out this "narrow exception" for prior convictions, the Apprendi Court explicitly declined to overrule its decision in Almendarez-Torres v. United States, 523 U.S. 224 (1998). Apprendi, 530 U.S. at 489-90 ("Because Almendarez-Torres had admitted the three earlier convictions for aggravated felonies - all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own - no question concerning the right to a jury trial or the standard of proof that would apply to a contested issue of fact was before the Court. . . . More important, . . . our conclusion in Almendarez-Torres turned heavily upon the fact that the additional sentence to which the defendant was subject was the prior commission of a serious crime.") (internal quotation marks and citation omitted).

In this case, petitioner waived his right to a jury trial on the prior conviction enhancements and agreed to have the trial court decide the truth of those allegations. (Reporter's Transcript at 588.) The court found the allegations true. (Clerk's Transcript at 242.) The trial court chose to impose the upper term based on the fact of petitioner's recidivism. (Reporter's Transcript at 663.) Petitioner does not have a right to a jury trial when his sentence was enhanced based on the facts of his prior conviction. Almendarez-Torres, 532 U.S. at 246; Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 488.

1  Moreover, there is no clearly established federal law that requires a jury trial on
2  the existence of a prior conviction.  Accordingly, the denial of this claim by California Court of
3  Appeal was not an unreasonable application of clearly established Supreme Court authority.  This
4  claim should be denied.

5  IT IS HEREBY RECOMMENDED that petitioner's application for a writ of
6  habeas corpus be denied.

7  These findings and recommendations are submitted to the United States District
8  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-
9  one days after being served with these findings and recommendations, any party may file written
10  objections with the court and serve a copy on all parties.  Such a document should be captioned
11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the
12  objections shall be filed and served within fourteen days after service of the objections.  The
13  parties are advised that failure to file objections within the specified time may waive the right to
14  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  DATED:  August 6, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

reid1627.157